| | |
|---|---|
| JOHN POLK,<br>　　　Plaintiff,<br><br><br>　　v.<br><br><br><br>SHERWIN-WILLIAMS COMPANY<br>　　Defendant. | No. 3:16-CV-1491 (MPS) |

## RULING ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Polk filed this action against the Sherwin-Williams Company ("Sherwin-Williams"), his former employer, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* Polk was the manager of a Sherwin-Williams store in East Hartford, Connecticut, until he was terminated on February 24, 2015. He alleges that Sherwin-Williams discriminated against him because of his race and retaliated against him after he filed an internal complaint about harassment. Sherwin-Williams has moved for summary judgment, arguing, among other things, that Polk has submitted no evidence from which a reasonable jury could find (1) that his employment was terminated under circumstances giving rise to an inference of discrimination or retaliation, or (2) that Sherwin-Williams's neutral, non-discriminatory and non-retaliatory explanation for his termination was pretextual. (ECF No. 60.) For the reasons set forth below, the motion is GRANTED.

## I.　　Undisputed Facts

The following facts are taken from the parties' Local Rule 56(a) statements and are undisputed unless otherwise noted.[1] Additional disputed facts are incorporated as relevant in Section III below.

## A. Polk's Employment with Sherwin-Williams

Polk, an African American man, began working for Sherwin-Williams in July of 2003 at one of the company's retail floorcovering stores in Somerset, New Jersey. (56(a)1 Stmt. ¶ 1, 3; 56(a)2 Stmt. ¶ 1, 3.) In February of 2005, Polk was promoted to the position of Branch Manager at a Sherwin-Williams location in Wethersfield, Connecticut. (Complaint, ECF No. 1 ¶ 7; Answer, ECF No. 28 ¶ 7). He eventually became the Store/Branch Manager of the company's East Hartford, Connecticut floorcoverings store. (56(a)1 Stmt. ¶ 2; 56(a)2 Stmt. ¶ 2.)  In 2015, there were three employees at the East Hartford location in addition to Polk: Assistant/Operations Manager Basil Moody, part time warehouse employee Jonathan Trapp, and Sales Representative Ahmed Saleh. (56(a)1 Stmt. ¶ 4–5; 56(a)2 Stmt. ¶ 4–5.) Moody and Trapp reported directly to Polk, while Saleh reported directly to Sales Manager Rich Gabe, who worked out of a different location. (56(a)1

---

[1] In response to several facts stated in Sherwin-Williams's Local Rule 56(a)1 statement, Polk indicates that he "lacks sufficient information to agree or disagree." (*See* Plaintiff's L.R. 56(a)2 Statement Part A, ECF No. 62 at 18 ¶¶ 22–31, 33–36, 38, 40, 55 ("56(a)2 Stmt.").)  I have reviewed the corresponding factual assertions in Sherwin-Williams's Local Rule 56(a)1 statement and find that they are supported by evidence in the record, although it appears that one citation refers to the incorrect paragraph of an affidavit. (*See* Defendant's L.R. 56(a)1 Statement, ECF No. 61 ¶ 40 ("56(a)1 Stmt.") (citing paragraph 8 of Melissa Tyler's Affidavit, ECF No. 60-3, while it appears the relevant material is in paragraph 9).) Accordingly, I treat these facts as undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e) (" If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."); L.R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1. . . ."). For facts about which the parties agree, I cite the relevant paragraphs of both parties' Local Rule 56(a) statements. For facts deemed admitted for the reason described above, I cite only Sherwin-Williams's Local Rule 56(a) statement.

Stmt. ¶ 5, 8; 56(a)2 Stmt. ¶ 5, 8.) Polk reported directly to District Manager Joseph Detreux. (Polk Deposition, ECF No. 60-4 at 21; *see also* Detreux Declaration, ECF No. 60-7 ¶ 2.)

### B. March 2013 Warning and Polk's Harassment Complaint

On March 4, 2013,[2] Detreux issued Polk a formal warning letter related to Polk's interactions with Saleh and a series of customer service issues. (56(a)1 Stmt. ¶ 14; 56(a)2 Stmt. ¶ 14; March 4 Warning Letter, ECF No. 60-7 at 33–34.) Polk acknowledges that he received the letter but denies that there was any basis for Detreux to issue him a warning at that time. (56(a)2 Stmt. ¶ 14.) The letter recounted issues purportedly discussed at a meeting on February 20 involving Detreux, Polk, and two other Sherwin-Williams human resources employees. (ECF No. 60-7 at 33.) The letter also attached the Sherwin-Williams non-harassment policy and described strategies for interacting with people in the workplace. (*Id.* at 34–35.) It noted that failure to exhibit "immediate and sustained improvement" in communication could "result in further disciplinary action up to and including termination." (*Id.* at 35.)

On March 8, 2013, Polk filed a harassment complaint against Detreux and Saleh. (56(a)1 Stmt. ¶ 15–16; 56(2) Stmt. ¶ 15-16; *see* Harassment Complaint, ECF No. 60-6 at 51–53.) The complaint asserted that Detreux and Saleh "constantly harass[ed]" him and "indicat[ed] that [he was] a difficult person to work with resulting in a corrective action for [Polk] with a possible termination." (ECF No. 60-6 at 52.) The parties agree that Sherwin-Williams investigated the complaint but dispute the details of the investigation. (56(a)1 Stmt. ¶ 17; 56(a)2 Stmt. ¶ 17.)

Sherwin-Williams asserts that the investigation was conducted by Area Human Resources Manager Michelle Fischman-Levy, who completed interviews with Polk, Saleh, Detreux, and

---

[2] Sherwin-Williams states that the warning was issued on March 3, 2013, (56(a)1 Stmt. ¶ 14) and Polk agrees (56(a)2 Stmt. ¶ 14), but the letter itself is dated March 4, 2013. (ECF No. 60-7 at 33.)

Sales Manager Gabe. (56(a)1 Stmt. ¶ 17–18; Fischman-Levy Declaration, ECF No. 60-7 at 49.) After the investigation, Fischman-Levy issued Polk a letter summarizing her findings. (Fischman-Levy Letter, ECF No. 60-7 at 57.) She stated that Detreux's March 4, 2013 warning letter regarding customer service issues, as well as an August 2012 warning letter by Detreux about inventory issues, were "justified." (ECF No. 60-7 at 57.) She also explained that she "found no evidence of behavior that [was] in violation of the Company's EEO and Non-Harassment Policies." (*Id.*) Sherwin-Williams produced a sworn declaration by Fischman-Levy in which she asserts that, throughout her investigation, Polk never stated that "he believed he was being harassed because of his race, or otherwise discriminated against because of his race . . . ." (Fischman-Levy Declaration, ECF No. 60-7 at 49.)

Polk contends that he sent his complaint to Don Katen, the Vice President of Human Resources for his region. (Plaintiff's L.R. 56(a)2 Statement Part B ("56(a)2 Stmt. B"), ECF No. 62 ¶ 8; ECF No. 60-4 at 46–47.) Katen initially called Polk about the complaint but did not follow up further. (*Id.*) Polk asserts that another Sherwin-Williams human resources representative, Billy Fowler, participated in the investigation together with Fischman-Levy. (56(a)2 Stmt. ¶ 17; Polk Affidavit, ECF No. 63 at 4.) He argues that Fischman-Levy "completely discounted [his] statements to her and she made no reference to Billy Fowler who was the primary investigator" responsible for interviewing Polk and his colleagues at the East Hartford store. (56(a)2 Stmt. ¶ 21.) He asserts that he told Fowler that Detreux "appl[ied] different criteria to [his] work performance than other store managers in the region." (Polk Affidavit, ECF No. 63 at 5.)

### C. Other Customer Service Complaints Involving Polk

In May of 2013, Detreux sent Polk a letter in connection with his annual performance review. (56(a)1 Stmt. ¶ 11; 56(a)2 Stmt. ¶ 12.) The letter summarized Detreux's conversation with

one of Polk's customers, who reportedly described Polk as "very difficult to work with" and stated

that he "talk[ed] down to customers." (ECF No. 60-7 at 39.) The letter advised Polk to make an

effort to provide "Trademark Customer Service in both your words and actions at all times." (ECF

No. 60-7 at 40.) Polk notes that he nevertheless received a raise of more than 7% following his

review. (56(a)2 Stmt. ¶ 11; 2013 Annual Review, ECF No. 63 at 46.)

In March of 2014, Saleh received an email from a customer complaining about the East

Hartford "office manager," which Saleh forwarded to Detreux and Gabe. (56(a)1 Stmt. ¶ 12; 56(a)2

Stmt. ¶ 12; March 2014 Customer Email, ECF No. 60-7 at 42.) The customer's email stated that

she called the East Hartford office "and spoke to the office manager ( He should be Fired!!!) I

called head office and complained about him." (ECF No. 60-7 at 42.) Detreux memorialized the

complaint and formally warned Polk about customer service issues in a letter on May 20, 2014.

(ECF No. 60-7 at 46.) Polk denies that he was the "office manager" to whom the customer referred.

(56(a)2 Stmt. ¶ 12; Polk Deposition, ECF No. 60-5 at 50.)[3]

### D.     February 2015 Complaint and Termination

On February 9, 2015, an individual named E. Paul Grimmeisen called Sherwin-Williams's

customer service line. (56(a)1 Stmt. ¶ 22.) Grimmeisen explained that over the past several years

he had offered housing and other assistance to individuals struggling with poverty, including

---

[3] Polk cites only his own deposition in denying the assertions in the letter and the customer's email. (*See* 56(a)2 ¶ 12 (citing ECF No. 60-5 at 47–56).) It is not clear that Polk affirmatively denied the allegations in that portion of his deposition. Rather, it appears that he simply could not recall the conversation at all. (*See, e.g.*, ECF No. 60-5 at 54–55 ("Q: Do you recall telling her not to call you the office manager because you are the store manager? A: No, I don't. Q: Do you recall hanging up on her? A: No, I don't. Q: Do you recall calling her rude? A: No, I don't.").) Nor could he remember the discussion that Detreux reported about the phone call afterwards. (*Id.* at 55 ("Q: Do you recall Mr. Deteux asking you whether you called her rude? A: No, I don't. . . . Q: But you do recall receiving this [letter from Detreux summarizing the incident]; is that correct? A: I don't recall receiving that document. . . .").)

Jonathan Trapp. (*Id.* at 25–26.) He reported that Trapp had resigned his position with Sherwin-Williams as a result of abuse and mistreatment by Polk. (*Id.* ¶ 27.) Six days later, Grimmeisen sent Sherwin-Williams a written complaint detailing Trapp's issues with Polk. (*Id.* ¶ 29; *see* Grimmeisen Letter, ECF No. 60-7 at 66.) Sherwin-Williams immediately contacted Trapp and requested that he provide a statement outlining why he chose to resign, which Trapp provided the same day. (56(a)1 Stmt. ¶ 30–31.) The company assigned Area Human Resources Manager Melissa Tyler to investigate the complaint. (*Id.* ¶ 32; 56(a)2 Stmt. ¶ 32.) Tyler met with Trapp, who confirmed that his statement was accurate and that he had resigned because of Polk's treatment. (56(a)1 Stmt. ¶ 33–35.) Tyler also interviewed and obtained statements from Moody and Saleh. (56(a)1 Stmt. ¶ 36–40; 56(a)2 ¶ 37, 39.)

Tyler and Gabe traveled to the East Hartford store on February 18, 2015 to interview Polk. (56(a)1 Stmt. ¶ 40.) When they arrived, Polk was leaving the store for lunch. (*Id.* ¶ 41.) Polk did not return to the store for at least one hour. (*Id.* ¶ 42 (asserting that Polk arrived 80 minutes later); 56(a)2 Stmt. ¶ 42 (asserting that Polk returned approximately 60 minutes later).) When Polk returned, Tyler and Gabe continued to wait while Polk spoke with another employee at the store. (56(a)1 Stmt. ¶ 43; 56(a)2 Stmt. ¶ 43.) Tyler and Gabe then informed Polk about Trapp's complaints against him; Polk responded by accusing Trapp of being a "performance issue." (56(a)1 Stmt. ¶ 44–45; 56(a)2 Stmt. ¶ 44–45.) At one point in the interview, Polk left the room. (56(a)1 Stmt. ¶ 49 (asserting that Polk "became agitated and abruptly exited the interview"; 56(a)2 Stmt. ¶ 49 (asserting that Polk left because he had to use the restroom).) While he was out of the room, he spoke with Saleh. The content of the conversation is disputed. Sherwin-Williams asserts that Polk confronted Saleh, asking why he was "telling people [they had] a problem." (56(a)2 Stmt. ¶ 50; *see* Tyler Declaration, ECF No. 60-3 ¶ 11(d) ("At one point, [Polk] abruptly exited the

interview and confronted Saleh and stated, in an aggressive fashion: 'do you have a problem with me?'".)  Polk counters that he simply asked Saleh to "assist in clarifying some of the issues raised by Jonathan Trapp's complaint." (56(a)2 Stmt. ¶ 50; Polk Aff., ECF No. 63 ¶ 11–12.)

Polk was placed on administrative leave immediately after his interview. (56(a)1 Stmt. ¶ 53; 56(a)2 Stmt. ¶ 53.) Based on her investigation, Tyler determined that Polk's conduct warranted termination. (56(a)1 Stmt. ¶ 54; 56(a)2 Stmt. ¶ 54.) She presented her findings to VP Katen, and the two agreed to terminate Polk's employment. (56(a)1 Stmt. ¶ 55.) On February 24, 2015, Tyler and Gabe met with Polk in person to inform him of his termination. (56(a)1 Stmt. ¶ 57; 56(a)2 Stmt. ¶ 57.) Following Polk's termination, Detreux interviewed and promoted Basil Moody to fill Polk's position. (56(a)1 Stmt. ¶ 60; 56(a)2 Stmt. ¶ 60.) Moody is African American. (56(a)1 Stmt. ¶ 60; 56(a)2 Stmt. ¶ 60.)

Polk agrees that he has never heard Detreux say anything racist or derogatory towards African Americans. (56(a)1 Stmt. ¶ 59; 56(a)2 Stmt. ¶ 59.)

## II.    Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id*. (quotation marks omitted).  On summary judgment, a court "must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III.    Discussion

Polk alleges racial discrimination and retaliation under Title VII and CFEPA. Connecticut courts "look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." *Feliciano v. Autozone, Inc.*, 316 Conn. 65, 73 (2015); *see also DeMoss v. Norwalk Bd. of Ed.*, 21 F. Supp. 3d 154, 170 (D. Conn. 2014) (applying federal precedents in assessing a retaliation claim under CFEPA). Accordingly, I address Polk's state and federal claims together.[4]

### A.  Polk Cannot Bear His Burden of Establishing a *Prima Facie* Case of Racial Discrimination

Courts evaluate Title VII and CFEPA racial discrimination claims under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, "a plaintiff first must establish a *prima facie* case of discrimination based on race." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To establish a *prima facie* case, the plaintiff must demonstrate that "(1) [he] is a member of a protected class; (2) [he] performed the job satisfactorily; (3) an adverse employment action took place; and (4) the action occurred under circumstances giving rise to an inference of discrimination." *White v. Connecticut Dep't of Children & Families*, 330 F. App'x 7, 9 (2d Cir. 2009). As for the fourth element, "[n]o one particular type of proof is required to show that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. . . . An inference of discrimination can

---

[4] Because I conclude that Sherwin-Williams is entitled to summary judgment on the merits of Polk's claims, I do not address its affirmative defense seeking enforcement of the settlement agreement.

be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action." *Sethi v. Narod*, 12 F. Supp. 3d 505, 536 (E.D.N.Y. 2014) (internal quotation marks, citations, and alterations omitted). Still, the plaintiff must produce *some* evidence demonstrating discriminatory intent—"a plaintiff's mere subjective belief that he was discriminated against does not sustain a discrimination claim." *Id.* at 536 (internal quotation marks and alterations omitted). "The burden a plaintiff, alleging that he was discriminated against by his employer, carries to survive a summary judgment motion at the *prima facie* stage is a minimal one." *Graham*, 230 F.3d at 38.

If the plaintiff establishes all four elements, the burden then "shifts to the employer to articulate a legitimate, non-discriminatory reason for the employee's dismissal." *Id.* Finally, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Id.*

### 1. Disparate Treatment

Sherwin-Williams argues that there is no evidence in the record from which a reasonable factfinder could conclude that Polk's termination "occurred under circumstances giving rise to an inference of discrimination." *Id.* I agree. Polk acknowledges that he never heard a Sherwin-Williams employee make a derogatory comment about his race. (See Polk Deposition, ECF No. 60-4 at 44–45 ("Q: Okay, so other than Joe DeTreux, did you have any issues or concerns with anyone else at Sherwin-Williams? A: No, I did not."); 56(a)2 Stmt. ¶ 59 (acknowledging that Polk never heard Detreux say anything "racist or derogatory toward African Americans").) He contends that he has met his burden of establishing a *prima facie* case by adducing evidence that he was

treated differently than similarly situated white store managers. "A showing that the employer treated a similarly situated employee differently is a common and especially effective method of establishing a *prima facie* case of discrimination . . . ." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (quotation marks omitted). "When considering whether a plaintiff has raised an inference of discrimination by showing that [he] was subjected to disparate treatment, [the Second Circuit has] said that the plaintiff must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [himself]." *Graham*, 230 F.3d at 39; *see also Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 516 (2012) ("[W]hen a plaintiff attempts to establish racial discrimination through the use of circumstantial evidence, the plaintiff must first present some evidence from which an inference may be drawn that other similarly situated individuals not in the protected class were treated more favorably than the plaintiff."). Thus, a plaintiff relying on the disparate treatment of similarly situated employees must show (1) the purportedly similar employees were "subject to the same performance evaluation and discipline standards" as the plaintiff, *Graham*, 230 F.3d at 40; (2) those employees engaged in conduct that "was of comparable seriousness" to the conduct for which the plaintiff was disciplined, *id.*; and (3) those employees nevertheless "went undisciplined" or received a punishment that was not of comparable seriousness to that imposed on the plaintiff, *id.* at 39–40.

Polk has offered evidence that he was the only African American store manager in his region. (Polk Deposition, ECF No. 63 at 74 ("Well, because I was the only African-American on [Detreux's] team, and I reported directly to him . . . ."); *id.* at 79 ("Q: Okay, and of those 14 stores, were you the only African-American branch manager? A: That's correct.").) A reasonable factfinder could infer that all store managers are "subject to the same performance evaluation and discipline standards." *Graham* 230 F.3d at 40. Polk identifies three sets of circumstances in which

he believes he was treated differently than the white store managers. (*See* 56(a)2 Stmt. B ¶¶ 4–6.)[5]

First, he asserts that Detreux refused to accompany him to visit customers but would accompany

white store managers on such visits. (Polk Deposition, ECF No. 63 at 82 ("He didn't want to visit

customers with me, but yet he would visit customers with other store – branch managers.").)

Second, he argues that Detreux interacted with him differently than other managers. (*Id.* at 74–

75.)  When pressed for an example, he asserted that Detreux criticized him for achieving an

operational profit at the East Hartford location, while he learned from other store managers that

Detreux had praised or rewarded them even when their stores lost money. (*Id.* at 74.) Third, he

claims that he received a formal warning when he struggled with a new computer system for

recording inventory while other store managers who struggled were not disciplined. (Polk

Deposition, ECF No. 64 at 17–18; ECF No. 63 at 112.)[6]

Polk does not contend that any of these incidents related to his eventual termination. He

has offered no evidence suggesting that the other store managers to whom he compares himself

had ever been the subject of complaints about their supervision of their direct reports or customer

service complaints—the offenses cited in Sherwin-Williams's termination letter. (ECF No. 60-3

at 28.) Indeed, Polk has provided no evidence demonstrating that Sherwin-Williams's responses

to the employee and customer complaints about him were in any way unusual. As a result, he has

---

[5] Polk identifies other examples of interactions with Detreux in which he believed Detreux was overly critical of his performance. (*See* 56(a)2 Stmt. B ¶¶ 3, 7, 12.) He does not allege, or provide any basis to conclude, that Detreux treated him differently than other store managers with respect to these incidents, and he provides no other explanation for his belief that Detreux was motivated by racial animus. (*Id.*) A plaintiff's subjective belief, without more, is insufficient to establish a *prima facie* case of discrimination. *See Sethi*, 12 F. Supp. 3d at 536.

[6] Polk cites only his own deposition in support of this assertion. Although the excerpts he cites suggest that he received a formal warning (ECF No. 64 at 15), and that other managers struggled with the new system (ECF No. 63 at 112) (noting that "no one knew how to fix" the problem with the new computer system), it is not clear from these excerpts whether Detreux was involved in issuing this warning, nor is it clear that other managers were not formally warned as well.

failed to adduce evidence from which a reasonable factfinder could conclude that the other store managers were "similarly situated in all material respects . . . ." *Graham* 230 F.3d at 40. Further, Polk offers no evidence that Detreux—the only person he says harbored discriminatory intent— was involved in the decision to terminate him. And he agrees that the Sherwin-Williams employees who ultimately decided to fire him—Tyler and Katen—did not discriminate against him. (*See* 56(a)1 Stmt. ¶ 58; 56(a)2 Stmt. ¶ 58.)[7]

### 2. Cat's Paw Theory of Liability

Polk asserts that, even if the individuals who decided to terminate his employment were not personally motivated by racial animus, he is nevertheless entitled to recover from Sherwin-Williams under a "cat's paw" theory of liability.[8] The "cat's paw" theory applies when "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez*, 835 F.3d at 272. Polk argues that the "cat's paw" theory applies here because Detreux "systematically critiqued [Polk's] style with colleagues and customers," and Detreux's "discussions with Rich

---

[7] Polk believes that Katen harbored animus toward him because Katen did not personally investigate his complaint against Detreux in March of 2013. (56(a)2 Stmt. ¶ 58.) Polk did not produce any evidence demonstrating that Katen typically investigated complaints personally. In his deposition, Polk acknowledged that he had no reason to believe that Katen treated him differently because of his race. (Polk Deposition, ECF No. 63 at 85 ("Q: Okay. Do you have any reason to believe that [Don Katen] treated you differently because of your status as an African-American . . . ? A: . . . I don't know other if other -- if he had other issues, so I can't honestly say that because I was African-American he didn't respond. . . .").)

[8] The name of the theory "derives from an Aesop fable . . . in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, 'devour[s] . . . them fast,' leaving the cat 'with a burnt paw and no chestnuts' for its trouble." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271–72 (2d Cir. 2016).

Gabe and Melissa Tyler in February, 2015 played a part in the decision to terminate [him]." (56(a)2 Stmt. ¶ 56.)[9]

Polk cannot carry his burden of establishing a *prima facie* case of discrimination under a "cat's paw" theory for two reasons. First, Polk has not adduced evidence that would support an inference that Detreux was motivated by racial animus when he issued the warnings cited by Sherwin-Williams in its termination letter. *See Vasquez*, 835 F.3d at 275 ("[A]n employer who negligently relies on a low-level employee's false accusations in making an employment decision will not be liable under Title VII unless those false accusations themselves were the product of discriminatory or retaliatory intent."); *see also Campbell v. Nat'l Fuel Gas Distribution Co.*, 252 F. Supp. 3d 305 at 214–215 (W.D.N.Y.) (rejecting a "cat's paw" theory where it was "quite clear that [another employee] targeted the Plaintiff by surreptitiously surveilling her" and that the information he provided to senior management "provided the basis for [their] decision to terminate Plaintiff," but "there [was] not evidence that he did so *because of Plaintiff's gender* rather than for some other reason."). Polk contends that Detreux overreacted to customer and employee complaints against him, but he does not contend that Detreux fabricated those complaints. (*See e.g.*, Polk Deposition, ECF No. 63 at 99 (disputing that it was appropriate for Detreux to warn him over customer service concerns, but acknowledging that Detreux warned him only after "he found out the details of what he had – what he had heard, [he] thought he had a problem, which wasn't a

---

[9] He offers no admissible evidence of such discussions, and the admissible evidence he cites does not support his assertion. He refers only to excerpts from his deposition in which he explained that he did not have any issues with employees other than Detreux. (*See, e.g.*, Polk Dep., ECF No. 60-4 at 52–54 ("Q: So if I get your concern correctly, you don't believe that Melissa Tyler or Richard Gabe necessarily had anything against you? It's more that if they were listening to what Joe Detreux had to say about you and acting on it that was your concern? A: I would say so. I had plenty of interaction with Richard Gabe as a district sales manager, . . . . I mean, I've eaten out with Richard Gabe. We visited clients. . . . .").

problem . . . ."); ECF No. 60-5 at 19–20 (asserting that Saleh was "coached" by Detreux to forward a customer complaint email without denying that the Detreux received and reviewed the email); ECF No. 63 at 102 (denying that Polk had a personal issue with Saleh without denying that Saleh complained to Detreux: "So I think what should have happened first, if Ahmed [Saleh] had that concern, was to tell me what his issue was, because I don't know what his issue was. . . .").) Further, Polk has not produced any evidence demonstrating how Detreux responded to similar complaints against white managers. Nor does he point to any evidence connecting the three incidents of disparate treatment that he describes—*i.e.*, Detreux's refusal to accompany him on customer visits, his undue criticism of Polk in comparison to other managers, and the warning concerning inventory—to the February 2015 decision to terminate his employment. And those three incidents alone are not sufficient to allow a reasonable factfinder to infer that Detreux was also motivated by racial animus when he warned Polk about employee management and customer service, especially because, as noted, those warnings were prompted by complaints from third parties.

Second, even if Detreux was overly critical of Polk because of his race and intended to cause Polk's termination, the evidence in the record is insufficient to allow a factfinder to infer that Sherwin-Williams was negligent to the extent that it relied on Detreux's warning letters to support Polk's termination.[10] Under a "cat's paw" theory of liability, it is not enough that a plaintiff

---

[10] Although Tyler's termination letter includes references to earlier warnings concerning Polk's customer interactions, the focus of the termination letter is Tyler's conclusion that Polk mistreated his subordinate, Jonathan Trapp. The letter begins by reciting that the company began an investigation after receiving a complaint (apparently the complaint from Grimmeison, which the letter incorrectly states the company received in February 2014) and also cites a finding that Polk was "rude, uncooperative and combative" during his February 18, 2015 interview. (ECF No. 60-3 at 27–29.) Especially because the termination followed quickly after the investigation of the Grimmeison complaint, there is some doubt that Polk has raised a genuine dispute about whether the earlier reports by Detreux about customer service issues were a "proximate cause" of

show that his employer relied on information from an allegedly biased employee—the plaintiff must produce evidence that the employer was negligent in doing so. *See Vazquez*, 835 F.3d at 275 ("Only when an employer in effect adopts an employee's unlawful animus by acting *negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII."); *see also Jones v. Dep't of Children & Families*, 172 Conn. App. 14, 31, 158 A.3d 356, 369 (2017) (holding that a "cat's paw" theory did not apply where the employer decided to terminate the plaintiff "through an independent review of the plaintiff's job performance"). In *Vazquez*, for example, the Second Circuit vacated a district court's decision granting a motion to dismiss where a female former-employee alleged that she had been terminated in retaliation for filing a complaint about sexual harassment. *Id.* at 270. She alleged that she had accused one of her male co-workers of sexual harassment after he repeatedly propositioned her and sent her a sexually-explicit text message. *Id.* at 270. When the alleged harasser learned of the complaint, he enlisted a friend to lie on his behalf and tell their supervisors that he and his accuser were romantically involved. *Id.* He also fabricated text messages to make it appear that the harassing text message exchange was consensual and that the female employee had participated. *Id.* at 271. The employer credited the male employee's explanation and terminated the *female* employee for sexual harassment without offering the female employee any opportunity to demonstrate that her harasser was lying. *Id.* The Second Circuit explained that the employer's decision was driven entirely by the accusations of the male employee, who was motivated by retaliatory animus over the female employee's initial complaint.

---

Polk's termination. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Nonetheless, I will assume for purposes of this ruling that the decision to terminate Polk was based, in part, on Detreux's earlier warning letters.

*Id.* at 274. The employer had not independently investigated the incident, had refused to allow the plaintiff to rebut her co-worker's false story, and had decided to terminate the plaintiff's employment less than a day after she filed her complaint despite obvious signs that her accused harasser had fabricated his evidence. *Id.* at 276. The employer was liable, then, because it was "negligent in allowing [the male employee's] false allegations, and the retaliatory intent behind them, to achieve their desired end." *Id.* at 274.

In contrast, here, the evidence in the record does not support an inference that Sherwin-Williams was negligent to the extent that it relied on Detreux's warning letters from 2012–2014. Polk's termination letter references "multiple counseling sessions from the Area HR Manager and District Management on how to effectively and respectfully manage employee and customer conflict." (ECF No. 60-3 at 28.) Although Polk contests the merit of the customer service and employee management complaints that prompted those counseling sessions, he points to no evidence suggesting that Sherwin-Williams should have known that they were inaccurate. He offers no evidence that controverts the facts underlying Detreux's warnings, and when questioned about one of them during his deposition, he indicated that he could not recall the incident at all. (*See* ECF No. 60-5 at 54–55 ("Q: Do you recall telling her not to call you the office manager because you are the store manager? A: No, I don't. Q: Do you recall hanging up on her? A: No, I don't. Q: Do you recall calling her rude? A: No, I don't. . . . Q: Do you recall Mr. Detreux asking you whether you called her rude? A: No, I don't. Do you recall Mr. Deteux asking you whether you called her rude? A: No, I don't. . . . Q: But you do recall receiving this [letter summarizing the incident from Detreux]; is that correct? A: I don't recall receiving that document. . . .").) Further, in contrast to the employer in *Vasquez*, Sherwin-Williams undertook thorough investigations of the complaints against Polk, speaking to multiple witnesses and affording him an opportunity to

be heard. For example, after Detreux's March 4, 2013 warning letter, Polk filed a harassment complaint against Detreux and Saleh. (ECF No. 60-7 at 52–54.) Sherwin-Williams assigned its Area Human Resources Manager to conduct an investigation of his complaint, which included an investigation of whether Detreux's March 4, 2013 letter violated company anti-harassment policy. The investigation concluded that there was no harassment, and that Detreux's March 4, 2013 warning letter, as well as an earlier August 2012 letter regarding an inventory issue, were "justified." (ECF No. 60-7 at 56–57.) While Polk now says that the human resources manager discounted statements he made to her and to Billy Fowler during the investigation, a decision by the investigator not to credit all of Polk's allegations does not suggest that the investigation was negligent.

In the end, Polk has submitted no evidence suggesting that Detreux was involved in the 2015 decision to terminate him or that Detreux issued the 2012–2014 warnings out of racially discriminatory animus. Further, Polk has failed to produce evidence suggesting that it was unreasonable for Sherwin-Williams to rely on Detreux's warnings. As a result, he has failed to carry his burden of establishing a *prima facie* case of racial discrimination under a "cat's paw" theory of liability.

### B. Polk Cannot Bear His Burden of Establishing a *Prima Facie* Case of Retaliation

Polk also claims that he was terminated in retaliation for filing a harassment complaint in March of 2013. The *McDonnell Douglas* burden shifting framework applies to retaliation claims under Title VII and CFEPA. *Miller v. Edward Jones & Co.*, 355 F. Supp. 2d 629, 642 (D. Conn. 2005); *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680 (2d Cir. 2009). Thus, Polk bears the burden of establishing a *prima facie* case of retaliation. The burden then shifts to Sherwin-

Williams to offer a legitimate, non-retaliatory explanation for his termination. If it does, the burden shifts back to Polk to show that Sherwin-Williams's proffered explanation is pretextual. A plaintiff establishes a *prima facie* case of retaliation by showing "that (1) [he] participated in a protected activity known to the defendant, (2) [he] suffered an adverse employment action, and (3) there exists a causal connection between the protected activity and the adverse employment action." *Hubbard*, 347 F. App'x at 680.[11]

### 1. Protected Activity

Sherwin-Williams argues that Polk cannot establish that he engaged in a protected activity. I agree. The term protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." *Benn v. City of New York*, 482 F. App'x 637, 638 (2d Cir. 2012) (quotation marks omitted). "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). "Thus, complaints that are vague and ambiguous and do not sufficiently articulate the nature of the harassment do not constitute a protected activity." *Miller*, 355 F. Supp. 2d at 643; *see also Jamil*

---

[11] The Supreme Court has interpreted Title VII to require a closer causal connection between alleged retaliation and an adverse employment action than that required between racial discrimination and adverse action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349 (2013). While a plaintiff need only show that racial discrimination was a "motivating factor" in his employer's decision to terminate him to establish the employer's liability under Title VII, to prove his retaliation claim, a plaintiff must prove that retaliation was the "but-for" cause of his termination. *Id.* at 360. Polk argues that the Supreme Court's holding in *Nassar* does not apply for his CFEPA retaliation claim and urges me to consider his state-law claim under the less-stringent "motivating factor" standard. Because I conclude that Polk could not carry his burden of establishing a *prima facie* case under either standard, I decline to address his argument here.

*v. Sec'y, Dep't of Defense*, 910 F.2d 1203, 1207 (4th Cir.1990) ("Title VII is not a general 'bad acts' statute.").

Polk filed a report on March 8, 2013, complaining of harassment by Detreux and Saleh, who is African American. (ECF No. 60-7 at 52–54; 56(a)1 Stmt. ¶ 9; 56(a)2 Stmt. ¶ 9.) Among other things, the complaint alleges that "Joseph [Detreux] reacts on false information from Ahmed [Saleh] and holds me accountable for any and everything" and that "Joseph with the support of Ahmed [is] constantly harass[ing] me and tear[ing] down my character." (ECF No. 60-7 at 53.) The complaint does not allege that Polk was harassed because he was a member of any statutorily protected class. (*Id.* at 53–54.) Michelle Fischman-Levy, a Sherwin-Williams employee who investigated Polk's complaint, attested that Polk never indicated that "he believed he was being harassed because of his race, or otherwise discriminated against because of his race, and Polk did not submit any follow-up documentation . . . stating that he was being harassed, discriminated against, or retaliated against." (ECF No. 60-7 at 49–50.) Polk contends that he spoke with a second Sherwin-Williams investigator, Billy Fowler, so Fishman-Levy's information was incomplete. (ECF No. 60-4 at 47.) But he does not point to any evidence demonstrating that he told Fowler that Detreux or Saleh had harassed him because of his race. (*See* Polk Affidavit, ECF No. 63 at 4–5.) At best, Polk asserts that he told Fowler that Detreux "appl[ied] different criteria to [his] work performance than other store managers in the region." (ECF No. 63 at 5.) He does not argue that Fowler should have inferred from his allegation that Polk believed Detreux was targeting him because of his race. Indeed, there is no evidence that Fowler knew or should have known that Polk was the only African American store manager who reported to Detreux. Nor is there evidence that Fowler communicated what Polk told him on that subject to those who made the decision to fire Polk. Further, a reasonable juror could only

consider Polk's statements to Fowler in the context of the overall investigation, which was initiated by a complaint that made no mention of race and was prompted in part by Detreux's alleged collaboration with Saleh, himself an African American, against Polk. As a result, the single reference to disparate treatment is insufficient to impute to Sherwin-Williams an understanding that Polk believed Detreux mistreated him because of his race. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient. . . ."); *see also Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 90 (2d Cir. 2016) ("[W]here a remark is susceptible of two or more meanings, only one of which may be relevant to discriminatory intent, it is perfectly appropriate for a court at the summary judgment stage . . . to ask whether a reasonable finder of fact, considering such a remark, could conclude from both the remark and other evidence in the record that the plaintiff met her burden of proving pretext.") No reasonable juror could conclude, based on the evidence in the record, that Sherwin-Williams knew or should have known that Polk filed his March 2013 complaint in an effort to "protest or oppose statutorily prohibited discrimination." *See Benn*, 482 F. App'x at 638.

### 2. Causal Connection Between Polk's Complaint and His Termination

Even if Polk could establish that his March 2013 harassment complaint constituted a protected activity, he has not adduced evidence from which a reasonable juror could infer that his complaint was causally connected to his termination. "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015). Polk was terminated nearly two years after he filed his complaint. (56(a)1 Stmt. ¶ 15, 57; 56(a)2 Stmt. ¶ 15, 57.) He does not argue that he could carry his burden to establish

causation by temporal proximity. Rather, he again relies on the "cat's paw" theory, asserting that Sherwin-Williams is liable because the decision to terminate him was tainted by information provided by Detreux, who was himself driven by retaliatory animus. His arguments fail for largely the same reasons that the "cat's paw" theory cannot carry his racial discrimination claims. Indeed, Polk's complaint and his opposition to the motion for summary judgment do not draw any clear distinction between the facts underlying his discrimination and retaliation claims. (Complaint, ECF No. 1 ¶¶ 4–15 (alleging facts in support of Polk's retaliation and discrimination claims); Memorandum in Opposition to Summary Judgment, ECF No. 62 at 6 (arguing in support of Polk's discrimination and retaliation claims without distinguishing between the facts that support each).) As a result, he has failed to adduce evidence from which a reasonable juror could conclude that Detreux acted out of retaliatory animus, and he has failed to show that Sherwin-Williams was negligent for relying on Detreux's reports. Polk's theory of causation with respect to his retaliation claim is even weaker than his discrimination claim, though, given the undisputed timeline of events. Polk's complaint is dated March 4, 2013—eight days *after* Detreux sent him a warning letter detailing personnel and customer service problems. (ECF No. 60-6 at 52.) The complaint describes other occasions on which Detreux allegedly singled Polk out for discipline. (S*ee id.* ("When he visit my store he immediately start to antagonize me which leads to a threat of corrective action that would result in again, a possible termination."); *id.* at 53 ("A recent conversation Joseph states that he now have two corrective action in my file and is close to having me removed.").) Thus, some of Detreux's criticism of Polk preceded Polk's allegedly-protected activity, and Polk makes no effort to show that Detreux's post-complaint criticism of him differed significantly from the pre-complaint criticism. Further, because some of the warning letters by Detreux predated the harassment complaint, those letters could not have been retaliatory and thus

the company's reliance on them could not have incorporated any retaliatory intent. In short, Polk has failed to submit any evidence suggesting a causal connection between any retaliatory animus and his eventual termination.

### C. Polk Cannot Demonstrate that Sherwin-Williams's Proffered Reason for Terminating Him Was Pretextual

Finally, Sherwin-Williams has offered a neutral, non-retaliatory, non-discriminatory reason for terminating Polk's employment, and supported that explanation with substantial evidence; Polk has not provided evidence that would allow a reasonable juror to conclude that Sherwin-Williams's explanation was pretextual. Most significantly, it is undisputed that Sherwin-Williams received a complaint by telephone on February 9, 2015, together with a letter six days later, alleging that Polk had seriously mistreated Jonathan Trapp, one of the employees at his store. (56(a)1 Stmt. ¶ 22.) For example, the complaint alleged that Polk had refused to pay Trapp for his overtime hours and had withheld Trapp's pay for a week before the employee's scheduled paid vacation. (Grimmeisen Letter, ECF No. 60-3 at 8.) It also alleged that Polk had left Trapp locked out of the store without his cell phone in a blizzard even after Trapp told Polk that he needed his phone to call for a ride home. (*Id* at 9.)

Sherwin-Williams immediately assigned Melissa Tyler to investigate the complaint, (56(a)1 Stmt. ¶ 33–40.) Trapp provided a statement affirming the allegations. (*See* ECF No. 60-8 at 13–14.)  Saleh also provided a statement indicating that Polk had created a "hostile working environment" and had threatened to fight him, and that it had "become almost impossible to work with [Polk] after those years of hostility." (ECF No. 60-8 at 24–25.) Polk testified in his deposition that he had a positive working relationship with Saleh (ECF No. 60-4 at 78–77), but he did not provide any basis to conclude that it would have been inappropriate for Sherwin-

Williams to rely on Saleh's representations. Tyler attested that Polk was rude to her when she interviewed him, he left the interview in frustration, and he confronted Saleh about Saleh's complaints against him. (ECF No. 60-3 at 4.) Polk provides an affidavit stating that Tyler mischaracterized these events (ECF No. 63 at 5–6), but he does not allege that Tyler's mischaracterization was the result of racial or retaliatory animus. (*See* ECF No. 60-4 at 53.) At the conclusion of her investigation, Tyler determined that "Polk's conduct warranted termination because his interactions [with] Trapp [were] unprofessional, unfair, and at times abusive." (Tyler Declaration, ECF No. 60-3 at 5.) Indeed, Polk does not dispute that "[f]ollowing her investigation, Tyler determined that Polk's conduct warranted termination." (56(a)1 Stmt. ¶ 54; 56(a)2 Stmt. ¶ 54.) Tyler presented her findings to the Regional Vice President of Human Resources, Don Katen, who concurred that termination was appropriate, a point that Polk also does not dispute. (56(a)1 ¶ 55; 56(a)2 Stmt. ¶ 55.) She informed him of his termination on February 24, 2015, more than two weeks after receiving the initial complaint. (56(a)1 Stmt. ¶ 47; 56(a)2 Stmt. ¶ 57.) It is undisputed that Sherwin-Williams hired Basil Moody, an African American man, as Polk's replacement based in part on Detreux's recommendation. (56(a)1 Stmt. ¶ 60; 56(a)2 ¶ 60.)

Ultimately, Polk asserts that Sherwin-Williams "used a critical letter from an individual with no direct knowledge of events to rationalize the plaintiff's termination . . . ." (Memorandum in Opposition to Summary Judgment, ECF No. 62 at 15.) But the undisputed facts demonstrate that Sherwin-Williams undertook a thorough investigation of the complaints against Polk and determined that those complaints were substantiated and warranted termination. (*See* 56(a)1 ¶ 55; ECF No. 60-3 at 5.) In his deposition, Polk acknowledged that the allegations, if true, would warrant termination. (ECF No. 60-4 at 95–96 ("Q . . . If you read this entire statement, is all of

this appropriate management behavior, if it's true? A: It's inappropriate management behavior. . . . Q: Okay, and grounds for termination, if it was true? A: If it was true? Yeah definitely.").) As explained above, Polk has not adduced evidence sufficient to allow a reasonable juror to conclude that the investigation was tainted by racial bias or retaliatory animus. Merely contesting the factual underpinnings of an employer's decision to terminate an employee is insufficient to raise a genuine dispute of material fact about whether the decision was pretextual. *See Duviella v. JetBlue Airways*, 353 F. App'x 476, 477 (2d Cir. 2009) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer.") (internal quotation marks omitted). "In short, although the Court recognizes that [Polk] believe[s] that [he was] treated harshly and unjustly, it is not the province of this Court to second guess the nondiscriminatory business decisions of an employer." *MacShane v. City of New York*, No. 05-CV-06021-RRM, 2015 WL 1298423, at *20 (E.D.N.Y. Mar. 23, 2015). The evidence in the record would not allow a reasonable juror to conclude that Sherwin-Williams's reason for terminating Polk was pretextual.

IV. **Conclusion**

In summary, Polk has failed to adduce evidence from which a reasonable juror could conclude that Sherwin-Williams terminated his employment because of his race or in retaliation for participating in a protected activity under Title VII or CFEPA. Sherwin-Williams's motion for summary judgment is therefore GRANTED. The Clerk is instructed to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 28, 2019